Nathan JONES, t/a Jones' Tavern,
Plaintiff,

v.

C. I. FOX, District Director of Internal
Revenue, Defendant and United States
of America, Intervenor.

Civ. No. 8926.

United States District Court
D. Maryland.

July 11, 1957.

Supplemental Opinion May 26, 1958.

Addendum June 27, 1958.

Bartholomew B. Coyne, Washington, D. C., for plaintiff. Leon H. A. Pierson, U. S. Atty., Wm. J. Evans, Asst. U. S. Atty., Baltimore, Md., Charles K. Rice, Asst. Atty. Gen., James P. Garland and William F. Kolbe, Attys., Dept. of Justice, Washington, D. C., for defendants.

R. DORSEY WATKINS, District Judge.

This is an action to recover fifty dollars paid by the plaintiff under protest in partial satisfaction of a cabaret excise tax assessment levied by the defendant in the amount of One Thousand, Five Hundred Fifty-eight Dollars and Ten Cents ($1,558.10) for the fourth quarter of 1954.[1] The answer of the defendant District Director, which challenged the jurisdiction of this court, was coupled with a counterclaim for the unpaid balance of the assessment plus interest. Plaintiff responded to the counterclaim by denying the legality of the assessment, and in the alternative claimed as a set-off and credit. Two Thousand, Nine Hundred Eighteen Dollars and Ninety-seven cents ($2,918.97), a reduction in personal income tax allegedly due because of the plaintiff's failure to deduct the cabaret tax from the gross income of his business in computing his income tax for the period April 1, 1952 through March 31, 1955. The United States then moved to intervene and the defendant district director's counterclaim was amended so as to permit its being treated as the complaint in intervention[2] of the United States.

The first question presented is one of jurisdiction, the defendant and the intervenor contending that the court lacks jurisdiction of a suit for refund of taxes when only a part of the tax assessed has been paid.

The relevant statutory provisions, found in Title 28 U.S.C. § 1340, and Title 26 U.S.C. § 7422(a), 1954 I.R.C., are as follows:

1. The plaintiff operated between October 1, 1954, and December 31, 1954, an establishment called Jones Tavern which the Internal Revenue Service, after an examination, concluded was a "cabaret," within the meaning of Section 1700(e)(1), Internal Revenue Code of 1939, 26 U.S.C. § 1700 (e) (1), and therefore subject to the 20% cabaret tax. The plaintiff's records revealed that for the fourth quarter of 1954 he had gross taxable receipts from this business of $7,790.51. The taxpayer was then requested to pay 20% of this amount as cabaret tax. He failed to do so but did, under protest on January 31, 1955, file a quarterly federal excise tax return for the fourth quarter of 1954 reporting the above gross receipts. A payment of $50 was made on January 31, 1955 and simultaneously a claim for its refund filed. The Commissioner of Internal Revenue, relying on the figures shown in the return, on February 19, 1955, duly made an assessment of cabaret excise taxes including interest for the period involved. Thereafter the plaintiff's claim for a refund was rejected and the instant litigation followed.

2. The order to amend and to permit the United States to intervene was conditioned upon the court finding that it has jurisdiction over the plaintiff's claim.

"§ 1340. Internal revenue; customs duties

"The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Customs Court."

"§ 7422. Civil actions for refund

"(a) No suit prior to filing claim for refund.—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof."

The defendant and intervenor freely admit that the meaning of the word "tax" as used in Section 7422(a) is ambiguous enough to be open to construction by the court in determining whether or not a taxpayer may litigate his assessed liability after a partial payment; and urge that the legislative history of (1) the creation of the Board of Tax Appeals;[3] of (2) the exempting of federal tax controversies from the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202;[4] and of (3) the prohibition of suits to enjoin the collection of federal taxes[5]

3. "The House Committee on Ways and Means explained the reason for the creation of the Board of Tax Appeals in part as follows (H.Rep. No. 179, 68th Cong., 1st Sess., pp. 7–8 (1939–1 Cum.Bull. (Part 2) 241, 246–247)):

" 'The committee recommends the establishment of a Board of Tax Appeals to which a taxpayer may appeal prior to the payment of an additional assessment of income, excess-profits, war-profits, or estate taxes. Although a taxpayer may, after payment of his tax bring suit for the recovery thereof and thus secure a judicial determination of the questions involved, he can not, in view of section 3224 of the Revised Statutes, which prohibits suits to enjoin the collection of taxes, secure such a determination prior to the payment of the tax. The right of appeal after payment of the tax is an incomplete remedy, and does little to remove the hardship occasioned by an incorrect assessment. The payment of a large additional tax on income received several years previous and which may have, since its receipt, been either wiped out by subsequent losses, invested in non-liquid assets, or spent, sometimes forces taxpayers into bankruptcy, and often causes great financial hardship and sacrifice. These results are not remedied by permitting the taxpayer to sue for the recovery of the tax after this payment. He is entitled to an appeal and to a determination of his liability for the tax prior to its payment.' "

"The Senate Committee on Finance offered a similar explanation. S.Rep.No. 398, 68th Cong. 1st Sess., pp. 8–9 (1939–1 Cum.Bull. (Part 2) 266, 271)." (Brief of defendant and intervenor, pp. 9–10.)

4. "(S.Rep. No. 1240 74th Cong., 1st Sess. pp. ——, [sic] (1939–1 Cum.Bull.(Part 2) 651,):

" 'Your committee has added an amendment making it clear that the Federal Declaratory Judgments Act of June 14, 1934, has no application to Federal Taxes. The application of the Declaratory Judgments Act to taxes would constitute a radical departure from the long continued policy of Congress (as expressed in Rev.Stat. 3224 and other provisions) with respect to the determination, assessment and collection of Federal Taxes.' " (Brief of defendant and intervenor, p. 12).

5. "Congress explained the purpose of the restriction against injunctions in 81 Cong. Record, part [sic] pp. 6859, wherein it was stated inter alia:

" 'But, sir, no such anticipatory interference by the courts is necessary; the internal revenue laws give the taxpayer the right to sue for a recovery of a tax after payment, if he believes it not justly due.

" 'Yet the courts still insist, in many cases in defiance of statute, in also giving him a suit to prevent collection of the tax, thereby creating an unfair situation as to taxpayers generally and also thwarting the collection of the Government revenues.

together with certain pronouncements [6] of the Supreme Court regarding the rights of taxpayers to judicial determination of their tax liabilities as well as the Supreme Court's definition of the word "tax" in Snyder v. Marks, 1883, 109 U.S. 189, 192, 3 S.Ct. 157, 27 L.Ed. 901, all indicate a basic doctrine that one must pay first in full and litigate later.

This is not a novel argument but is rather one which has been considered by a number of district and appellate courts. Apparently only four decisions in any way support the position of the defendant and the intervenor (Suhr v. United States, 3 Cir., 1927, 18 F.2d 81, 83; Bushmiaer v. United States, D.C.W.D. Ark.1955, 131 F.Supp. 589, 595; Flora v. United States, D.C.D.Wyo.1956, 142 F. Supp. 602, 604, affirmed on appeal as to lack of jurisdiction, 10 Cir., 1957, 246 F.2d 929). The statement in the Suhr case is dictum and is in direct conflict with a later direct holding of the same Circuit (Sirian Lamp Co. v. Manning, 3 Cir., 1941, 123 F.2d 776, 779, 138 A.L.R. 1423). On appeal the Bushmiaer case was reversed (Bushmiaer v. United States, 8 Cir., 1956, 230 F.2d 146). In Flora v. United States, supra, the district court relying on the Suhr case and without reference to Sirian Lamp Co. v. Manning, supra, and thus considering the Third Circuit committed to the rule that full payment of a tax assessment is a prerequisite to a court suit for a refund, nevertheless was sufficiently doubt-ful as to its conclusion that it lacked jurisdiction, that it proceeded to pass on the merits of the case. In addition to the Third and Eighth Circuits, the Second Circuit has held that jurisdiction exists where only a part of the tax assessed has been paid (Coates v. United States, 2 Cir., 1940, 111 F.2d 609, 610; see also Hanchett v. Shaughnessy, D.C.N.D.N.Y. 1954, 126 F.Supp. 769, 771). The cases cited thoroughly and ably discuss the arguments for and against the contention of the defendant and the intervenor. The legislative history and the pronouncements of the Supreme Court relative to the rights of taxpayers to judicial determination of their tax liabilities, relied on by the defendant and intervenor, have been carefully considered in these cases. The decided weight of authority, and this court feels the most persuasive interpretation of Section 7422(a), is to the effect that jurisdiction exists. The reasoning and analysis of the courts so holding need not be repeated here but several additional comments might well be made.

The only Supreme Court decision cited by the defendant and intervenor not referred to in the opinions mentioned above is Snyder v. Marks, supra, which defined the word "tax" as used in Section 3224 of the Revised Statutes, now Section 7421(a) of the Internal Revenue Code of 1954, prohibiting suits restraining the assessment or collection of tax, by reference to the enactment then containing provisions substantially similar

---

" 'This injunctive interference is in violation of an act enacted in 1867 still on the books. It reads as follows:

" ' "Revised Statutes, Section 3224. No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court."

" 'The reason for this statute is that, as courts are without authority to equalize taxes or to make assessments, such suits would enable those liable for taxes in some amount to delay payment or possibly to escape their lawful burden, and so to thwart the collection of revenues.' " (Brief of defendant and intervenor p. 13).

6. Cheatam v. United States, 1875, 2 Otto 85, 92 U.S. 85, 88–89, 23 L.Ed. 561; Kings County Savings Institution v. Blair, 1886, 116 U.S. 200, 205, 206, 6 S. Ct. 353, 29 L.Ed. 657; Dodge v. Osborn, 1916, 240 U.S. 118, 120, 36 S.Ct. 275, 60 L.Ed. 557; Graham v. Du Pont, 1923, 262 U.S. 234, 255, 43 S.Ct. 567, 67 L.Ed. 965; Phillips v. Commissioner, 1931, 283 U.S. 589, 599, 51 S.Ct. 608, 75 L.Ed. 1289; United States v. Jefferson Electric Mfg. Co., 1934, 291 U.S. 386, 395–396, 54 S.Ct. 443, 78 L.Ed. 859; Dobson v. Commissioner, 1943, 320 U.S. 489, 496, 64 S.Ct. 239, 88 L.Ed. 248, rehearing denied, 1944, 321 U.S. 231, 64 S. Ct. 495, 88 L.Ed. 691.

to the provisions of Section 7422(a) of the Internal Revenue Code of 1954. The definition given is "that which is in a condition to be collected as a tax, and is claimed by the proper public officers to be a tax, although on the other side it is alleged to have been erroneously or illegally assessed." (109 U.S. at page 192, 3 S.Ct. at page 159). From this it is argued that "tax" means the amount assessed, and a suit for the recovery of tax must be a suit to recover the amount assessed, thereby necessitating full payment of the tax. In Snyder v. Marks, supra, the Supreme Court had before it a case in which the appellant was seeking to restrain the collection of an assessed tax. It was urged that the word "tax" as used in the prohibition against injunctions meant only a legal tax, and, therefore, an illegal tax did not fall within the inhibition of the statute. Tax was defined as quoted above to meet and reject the contention of the appellant. The definition is neither helpful nor relevant to the issue herein involved. The court had previously said in 109 U.S. at page 192, 3 S.Ct. at page 159, "The first part of section 19 related to a suit to recover back money paid for a 'tax alleged to have been erroneously or illegally assessed or collected,' * * *." This language clearly indicates that a suit for a refund is not a suit to recover a tax or, as defined by the defendant and intervenor, the amount assessed, but is a suit to recover money paid, a distinction made by the Eighth Circuit in Bushmiaer v. United States, supra, 230 F.2d at page 149, in connection with the claim for refund. "The claim for refund, however, is not for a refund of the tax as assessed but only for a refund of the tax as paid." Snyder v. Marks, supra, rather than supporting the position of the defendant and intervenor, weakens it.

It should be noted that the cabaret tax is an excise tax. The Tax Court has not been granted jurisdiction over excise taxes.[7] The fact that, if this court does not have jurisdiction, the plaintiff is denied a judicial determination of his liability for the tax prior to payment in full of the amount assessed, a determination to which those challenging asserted deficiencies in income, estate, or gifts taxes are expressly entitled through recourse to the Tax Court, is, of course, not determinative of the legal soundness of his position but it does render inapposite the reasoning of cases denying jurisdiction in part because "Congress, by the enactment of the statute [creating the Board of Tax Appeals], provided the remedy whereby the taxpayer could have the assessment reviewed and redetermined prior to the payment. * * *" and the taxpayer "deliberately failed and refused to test the validity of the deficiency assessment * * *," Bushmiaer v. United States. supra, D.C.W.D. Ark., 131 F.Supp. at page 594. Even if the decision of the Tenth Circuit is correct with respect to suits to recover income taxes, it is inapplicable here. It was based almost entirely in reliance on the legislative history of the creation of the Board of Tax Appeals and on cases evidencing the fact that since "the establishment of the tax court the distinctive purpose of its creation has been judicially recognized and its intended powers guarded", which factors caused the court to conclude that jurisdiction in the district court would serve "only to conveniently defeat the established purpose and function of the tax court." Flora v. United States, 10 Cir., 246 F.2d 929, 931. On the other hand, the Second, Third and Eighth Circuits have held, in effect, that persons desiring to litigate liability for income taxes have the choice of three methods of proceeding.

7. The brief of the defendant and intervenor gives as the reason for the failure to extend the jurisdiction of the Tax Court to excise taxes the fact that excise taxes are usually collected by one who does not bear the burden of paying the tax and are, therefore, generally collected prior to the contesting of their validity.

If these be correct, a fortiori the court should deny the contention of the defendant and intervenor herein asking that the plaintiff, in his litigation of liability for excise taxes, be limited to one method of proceeding, and that one conditioned upon the oftentimes harsh prerequisite of prior payment in full of the challenged assessment.

An excise tax is by nature divisible or separable. In Friebele v. United States, D.C.D.N.J.1937, 20 F.Supp. 492, although the government contended that the taxpayer was required to pay the entire assessment against him of documentary stamp taxes due prior to instituting his suit for a refund in the district court, and although the court held that prepayment was a prerequisite to suit, this requirement was met by payment in full of the amount due for stamps for any one given document, even although this amount was but a partial payment of the entire assessment. This court is by no means sure that the plaintiff could not have proceeded in such a way as to have constituted the fifty dollars paid by him full payment of an independent taxable item. In a most important case, Geer v. Birmingham, D.C.N.D. Iowa 1950, 88 F.Supp. 189, reversed on other grounds, Birmingham v. Geer, 8 Cir., 1950, 185 F.2d 82, certiorari denied 1951, 340 U.S. 951, 71 S.Ct. 571, 95 L.Ed. 686, which will be referred to later in some detail as it is controlling on the question of whether or not an establishment is operating as a cabaret or as a dance hall, the plaintiffs proceeded to litigate their liability for the cabaret tax by payment of the tax on one night's receipts. They continued thereafter to pay the tax demanded and the court notes 88 F.Supp. at page 191:

"So far as these particular plaintiffs are concerned the question of their tax liability or of their securing tax refunds in the amount of several thousand dollars is dependent upon the final determination of the validity or invalidity of their claim for refund in this case since plaintiffs have continued since De-

cember, 1948, to pay the tax demanded by the Collector under Section 1700(e) of the Internal Revenue Code, supra. *There is also, under Section 1700(e), potential liability of the plaintiffs for taxes on similar receipts prior to December 9, 1948." (Emphasis supplied.)*

The court makes no mention of an assessment having been made and characterizes the suit as one for a refund of taxes illegally and erroneously collected. It should be remembered in the instant case that the fifty dollars was paid, and apparently simultaneously a claim for refund filed, in January of 1955 prior to the deficiency assessment in February of 1955. No explanation has been made to the court as to why the plaintiff was requested to, and did, file a quarterly return when Section 101.31(e) (1) of the Federal Tax Regulations of 1955 required a monthly return to be filed and Section 101.33(a) required monthly payment of the tax. It becomes unnecessary, however, in view of the fact that this court is satisfied that full payment of an excise tax assessment is not a prerequisite to a court suit for a refund, to decide what constitutes the smallest independent taxable item of the cabaret tax.

Recent legislative history of statutes dealing with the jurisdiction of district courts in suits to recover taxes wrongfully assessed or collected evidences an increasing liberality on the part of Congress in favor of the taxpayer. The House of Representatives Committee on the Judiciary, in considering the 1954 amendment of Title 28 U.S.C. § 1346(a) (1) made the following statement:

"At the present time, no suit against the United States to recover taxes may be brought in a district court if the claim exceeds $10,000. There appears to be no valid reason for thus restricting the district court's jurisdiction. The original reason for creating the limitation evidently was the feeling that taxpayers [sic] wealthy enough to be assessed taxes in excess of $10,000

could afford to go to Washington and pursue his rights in the Court of Claims. The remedy in the district court was created for the purpose of giving the smaller taxpayers who could not afford to pursue an action in Washington a practical remedy. *The committee thinks that the greatly increased tax burden and the great increase in litigation of this type which it has produced has made the fixing of any such monetary dividing line between remedies available to different taxpayers no longer practical or desirable.* It is our opinion that all taxpayers, [sic] regardless of their [sic] financial status, should be permitted to pursue his remedy in the jurisdiction where he resides, or where the tax accrued, and not be required to go to the expense and practical difficulty of taking himself, his records, and his witnesses to Washington, procuring Washington counsel, and trying his case before the Court of Claims." (1954 U.S.Code Cong. and Adm. News, Vol. 2, p. 2717). (Emphasis supplied.)

Even more pertinent is the enactment of Section 7422(e) of Title 26 U.S.C. which provides:

"(e) Stay of proceedings.—If the Secretary or his delegate prior to the hearing of a suit brought by a taxpayer in a district court or the Court of Claims for the recovery of any income tax, estate tax, or gift tax (or any penalty relating to such taxes) mails to the taxpayer a notice that a deficiency has been determined in respect of the tax which is the subject matter of taxpayer's suit, the proceedings in taxpayer's suit shall be stayed during the period of time in which the taxpayer may file a petition with the Tax Court for a redetermination of the asserted deficiency, and for 60 days thereafter. If the taxpayer files a petition with the Tax Court, the district court or the Court of Claims, as the case may be, shall lose jurisdiction of taxpayer's suit to whatever extent jurisdiction is acquired by the Tax Court of the subject matter of taxpayer's suit for refund. If the taxpayer does not file a petition with the Tax Court for a redetermination of the asserted deficiency, the United States may counterclaim in the taxpayer's suit, or intervene in the event of a suit as described in subsection (c) (relating to suits against officers or employees of the United States), within the period of the stay of proceedings notwithstanding that the time for such pleading may have otherwise expired. The taxpayer shall have the burden of proof with respect to the issues raised by such counterclaim or intervention of the United States except as to the issue of whether the taxpayer has been guilty of fraud with intent to evade tax. This subsection shall not apply to a suit by a taxpayer which, prior to the date of enactment of this title, is commenced, instituted, or pending in a district court or the Court of Claims for the recovery of any income tax, estate tax, or gift tax (or any penalty relating to such taxes)."

This Section clearly contemplates jurisdiction in a district court of a suit to recover a tax[8] without the payment of the full amount of the tax deficiency assessed subject only to compliance with the provisions of Section 7422(a) requiring as a condition precedent to suit the filing of a claim for refund or credit provided the claim is filed within the period of limitations prescribed by Section 6511(a) and the suit is brought within the period required by Section 6532(a)(1). Concurrent jurisdiction in the district court and in the Tax Court over

---

8. Only the recovery of income, estate, and gift taxes in the district court is dealt with as there can be no problem of concurrent jurisdiction in the case of excise taxes over which the Tax Court has not been granted jurisdiction.

the same case is not expressly conditioned upon the suit for refund being brought prior to the issuing of the notice of deficiency nor indeed should any such requirement be read into the enactment for to do so would be to take away from the taxpayer the right of choice as to the court in which he prefers to litigate his case, a right explicitly given him by Section 7422(e). The House [9] and Senate [10] reports on this section likewise suggest this interpretation.

This court, accordingly, holds that it has jurisdiction over the present suit.

In passing on the merits of the case it becomes necessary to describe in some detail the manner in which the plaintiff's business was conducted.

The plaintiff presently operates, and did operate between October 1, 1954 and December 31, 1954, an establishment in Glen Arden, Maryland, about four miles from the District of Columbia, in a building on the George Palmer Highway, Route 704, in Prince Georges County. The said business was begun in September, 1950, when it was operated by a Maryland corporation of which the plaintiff Nathan Jones was president, Lewis Abbney was vice-president, and Anne W. Jones, wife of the plaintiff, was secretary-treasurer. The corporation operated the said business until April 1, 1952, when ownership and operation thereof was assumed by the plaintiff individually.

The building in which the business has been conducted since September, 1950, is a two-story cinder block structure whose dimensions at the time of construction by the plaintiff in 1948 were thirty (30) feet by fifty (50) feet. A later addition, a storage room, was added in 1951, to bring the outside dimensions of the building to its present length and width of sixty-four (64) feet by thirty (30) feet. During the period in question, the first floor contained ten tables, accommodating approximately forty persons. Besides the area occupied by tables there were rest rooms, a kitchen, a service counter and a "juke box". As evidenced by both a floor plan and the

9. 1954 U.S.Code Cong. & Adm.News, Vol. 3, pp. 4579–4580.

10. 1954 U.S.Code Cong. & Adm.News, Vol. 3, p. 5261, in part as follows:
"Subsection (e) of this section is a new provision to cover the situation where there is concurrent jurisdiction in the district court (or Court of Claims) and in the Tax Court over the same case. *This may arise, for example, where the taxpayer files suit for refund in the district court and, while the suit is pending, a notice of deficiency is issued and he appeals that notice to the Tax Court.* Under subsection (e), if the notice of deficiency is issued before the case is heard in the district court (or Court of Claims), the proceeding must be stayed for the 90-day period of the notice and for 60 days thereafter. If the taxpayer appeals to the Tax Court then the district court (or the Court of Claims) shall lose jurisdiction over the refund. If the taxpayer does not appeal, the United States may then counterclaim in the taxpayer's suit, or intervene if this is a suit against the district director, even though the time for filing such counterclaim or petition for intervention may have otherwise expired, and upon such counterclaim or intervention the taxpayer will have the same burden of proof as he would bear if he had appealed the case to the Tax Court.

"The result under subsection (e) is to give jurisdiction over the cause of action to only 1 court *(2 courts may acquire jurisdiction under existing law), and to give the taxpayer the choice of which court shall have jurisdiction.* The taxpayer, by filing a petition in the Tax Court, would cause that court to have sole jurisdiction, or, by failing to file a petition in the Tax Court, would cause the district court or the Court of Claims to have sole jurisdiction.

"Subsection (e) does not apply if the case in the district court or Court of Claims has already proceeded to a hearing, that is, to actual trial. On the other hand, *it will apply to prevent suit in the district court* or Court of Claims *after the receipt of a notice of deficiency in any case where the taxpayer appeals from that notice to the Tax Court.*

"Your committee has amended subsection (e) as contained in the House bill by providing that such subsection will not be effective with respect to any suit pending, instituted, or commenced before the enactment of this act."

taxpayer's testimony, there was no dancing on this first floor. The second floor contained twenty-one tables seating four persons per table located around the perimeter of the room. There was also a storage area for folding chairs, which would indicate that a few more persons could be seated if necessary. In the center of the room, comprising most of the available space, was an area for dancing measuring eighteen (18) feet by thirty-five (35) feet and having a capacity of two hundred and fifty people. Thus many more persons could dance than could be accommodated at the tables on the second floor, and testimony established it was not necessary that a patron have a seat at a table in order to be admitted.

The music for dancing was furnished by a juke box [11] which was located on the ground floor, and from which the music was piped to the dance floor upstairs by a loudspeaker, which was located on the second floor. The coins to operate the juke box were furnished by the patrons. No admission was charged to the upstairs portion of the building and patrons were allowed to pass freely up and downstairs. Practically all of the plaintiff's patrons, including those seated on the first floor, availed themselves of the dancing privileges and it frequently occurred that the dance floor was filled to capacity. Plaintiff never offered any entertainment to his patrons such as singers, dancers, soloists, floor shows, or any other type of acts; the only entertainment he provided was juke box music for his patrons' dancing, and the juke box was in nearly constant operation.

As to food and beverages the same items were available on both floors and were in the nature of light snacks, such as hamburgers; cheeseburgers; ham, chicken and cheese sandwiches; pigs' feet; and pickles and potato chips, all of which were sold at prices comparable to other retail outlets in the plaintiff's area of business. Cigarettes, cigars and gum were also offered for sale at regular retail prices. Plaintiff sold no hard liquor, and the only beverages available were beer, and soft drinks, which were sold at prices comparable to other retail outlets in his area. The aforesaid prices were not changed at any time since the time the business was opened. It was not necessary for a patron to buy any food or drink in order to dance. Plaintiff testified that the average bill per patron was between eighty cents ($.80) and one dollar and fifty cents ($1.50), and that over ninety per cent (90%) of his patrons came from the District of Columbia. There was one main and one minor source of revenue. Money from the coin-operated juke box was divided fifty-fifty between the taxpayer and the concern owning the device. According to the taxpayer's wife's interpretation of the books, 50% of these receipts amounted to a few hundred dollars a month. Apparently the sale of beer was the major source of the $7,790.-51 taken in during these three months as the taxpayer testified that receipts from the sale of food and soft drinks were negligible.

The hours of operation of the business by the plaintiff were 6:00 P.M. to 2:00 A.M. on Mondays through Fridays; 4:00 P.M. to midnight on Saturdays, and 2:00 P.M. to midnight on Sundays. Plaintiff testified there was no substantial change in the manner of operation of his business since its inception, and that a large majority of his business was done after nine o'clock in the evening.

Section 1700(e) (1) of the Internal Revenue Code of 1939, as amended, which imposes the so-called cabaret tax provides:

"A tax equivalent to 20 per centum of all amounts paid for admission, refreshment, service, or mer-

---

11. During other periods not herein involved music was provided on Friday, Saturday, and Sunday evenings by a small band of five musicians and a nominal admission fee of fifty cents was charged, but, as the plaintiff's method of operation at other times is not relevant to the instant inquiry, further differences will not be noted.

459

chandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The term 'roof garden, cabaret, or other similar place' shall include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. *In no case shall such term include any ballroom, dance hall, or other similar place where the serving or selling of food, refreshment, or merchandise is merely incidental, unless such place would be considered, without the application of the preceding sentence, as a 'roof garden, cabaret, or other similar place'.* A performance shall be regarded as being furnished for profit for purposes of this section even though the charge made for admission, refreshment, service, or merchandise is not increased by reason of the furnishing of such performance. No tax shall be applicable under paragraph (1) or (3) of subsection (a) on account of an amount paid with respect to which tax is imposed under this subsection." (Emphasis supplied.)

The underlined portion of Section 1700 (e) (1) was inserted by Act October 20, 1951, Section 404(a) and the purpose of this amendment was explained as follows:

"This section amends section 1700 (e) (1) of the Internal Revenue Code to exempt from the cabaret tax bona fide dance halls, ballrooms, and other similar places where the serving or selling of food, refreshments, or merchandise is merely incidental to the music and dancing privileges furnished unless the conduct of the place is such as to bring it within the normal concept of a roof garden, carbaret [sic], or similar place. This determination will be made by reference to the over-all operation of the establishment, including such factors as the relative income from the several activities over a period of time, the relative portion of space devoted to the various activities, the type of refreshments served or sold, the scope and character of the entertainment furnished, and the hours of operation.

"The purpose of this amendment is to make it clear that the principles set forth by the district court in the case of Geer v. Birmingham, (88 F.Supp. 189) are controlling in the determination of whether the establishment involved is operating as a carbaret [sic] or as a dance hall, and to avoid the broad construction placed upon the statute in the case of Avalon Amusement Corporation v. United States, 7 Cir., (165 F.2d 653) and in the court of appeals decision reversing the decision of the district court in the Geer case (Birmingham v. Geer, 185 F.2d 82), which require that dance halls and similar establishments be taxed as cabarets, even though the serving or selling of food, refreshments, or merchandise is merely incidental.

"The amendment made by this section shall take effect at 10 a. m., on the first day of the first month which begins more than 10 days after the date of the enactment of this bill." (1951 U.S.Code Cong. & Adm.Service, Vol. 2, p. 1915).

Thus the district court's decision in the Geer case, although decided prior to the 1951 amendment, is controlling on the issue of whether or not the plaintiff's method of operation subjects the receipts from his business to the cabaret tax.

The use of the phrase "cabaret tax" is, in and of itself, misleading. The wording of Section 1700(e) (1) is not limited to places generally thought of as cabarets but is expressly extended to hotels, restaurants or any public place

where music and dancing privileges are afforded in connection with the selling of food, etc. "Entertainment Tax" would be more appropriate as Section 1700 was originally enacted in 1917 to impose "a tax in the nature of an admissions tax upon entertainments of various kinds." (Geer v. Birmingham, supra, 88 F.Supp. at page 196). A tax on admissions alone was unsatisfactory in that it did not reach those establishments which, while offering entertainment, did not charge an admission fee but rather derived their revenue from the sale of food and drink. Therefore, Congress decided to treat a certain percentage of the gross receipts of such establishments as an admission fee and apply the admission tax to such percentage.

> "Thus, from its inception, the admissions tax was imposed *upon the general field of entertainment,* which was further subdivided for purposes of the imposition of the tax into two different categories because of the nature of the entertainment subject to the tax. On the one hand was that form of entertainment to which a direct admission charge was made upon the patrons, as is the case with theaters, skating rinks or the like, and on the other hand that form of entertainment to which no admission charge as such was made but rather the charge for admission was included in whole or in part in the price paid by the patron for refreshment, service or merchandise. 'What are commonly known as cabarets' comprised this second category." (Geer v. Birmingham, 88 F. Supp. 189, 197). (Emphasis supplied.)

In 1942 after several court decisions [12] refusing to apply the tax to establishments which neither charged an admission fee nor increased the prices for food and drink so as to include a hidden charge for admission, Congress amended the statute by providing in substance that a public performance is deemed to be for profit despite the fact that any charges made are not increased by reason of the furnishing of such performance. Three cases cited by Judge Graven in Geer v. Birmingham as correctly interpreting the law prior to and after the 1942 amendment are factually quite close to the plaintiff's method of operation and dictate the conclusion that after the 1942 amendment and prior to the 1951 amendment, an establishment which offered entertainment, consisting of dancing privileges to mechanical music, and derived its revenue from the sale of food or drink rather than from the charging of an admission fee was taxable as a cabaret or other similar place (Schuster's Wholesale Produce Co. v. United States, D.C.W.D.La.1943, 49 F. Supp. 909; Rogers v. Stuart, D.Ariz. 1945, 80 F.Supp. 436; Baldwinson v. United States, D.C.W.D.Wash.1948, 80 F.Supp. 687).

The issue then becomes whether or not the 1951 amendment excludes from the tax an establishment such as the plaintiff's. Section 1700(e) (1) first defines a cabaret or other similar place as a "public place where music and dancing privileges * * * are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise." The plaintiff obviously comes within this definition and must in order to prevail, bring himself within the exclusion of the succeeding sentence by showing he is operating a "ballroom, dance hall, or other similar place *where the serving or selling of food, refreshment, or merchandise is merely incidental * * *.*" (Emphasis supplied.)

The plaintiff argues the italicized portion of the statute is merely descriptive because by definition "the distinguishing feature of ballrooms and dance halls and other similar places is that they feature dancing; in other words,

---

12. United States v. Broadmoor Hotel Co., D.C.D.Colo.1929, 30 F.2d 440; Deshler Hotel Co. v. Busey, D.C.S.D.Ohio 1941, 36 F.Supp. 392, affirmed Busey v. Deshler Hotel Co., 6 Cir., 1942, 130 F.2d 187, 142 A.L.R. 563.

the principal purpose is to furnish dancing privileges to the public, and incidentally thereto, offer light snacks, and refreshments and merchandise." If the plaintiff's contention is valid, then the italicized portion of the statute is mere surplusage as would be the sentence following the one italicized above. This sentence provides that a ballroom where the selling of food is incidental is excluded from the tax "unless such place would be considered, without the application of the preceding sentence, as a 'roof garden, cabaret, or other similar place'." Under the plaintiff's interpretation, the statute would in effect tax a roof garden or other similar place; exclude a ballroom or other similar place; and again tax a roof garden or other similar place. If the language "where the * * * selling of food * * * is merely incidental" be interpreted as meaning where the revenue from the selling of food is incidental to the revenue from admission fees, then each sentence considered above can be given meaning. A roof garden or other similar place is taxed as a cabaret under Section 1700(e) (1); a ballroom or other similar place is excluded if its principal source of revenue is from admission fees which are taxable under Section 1700(a) (1); but a roof garden or other similar place is taxed as a cabaret even if its principal source of revenue is from a source other than the selling of food, drink, or merchandise. Thus a roof garden or a cabaret can not escape the twenty per cent cabaret tax merely by charging an admission fee and meeting the "incidental" test. Whether or not an establishment is a roof garden or a cabaret will be determined by the tests [13] set down in Geer v. Birmingham, supra.

That "incidental" as it appears in Section 1700(e) (1) refers to the source of revenue has been the conclusion in two recent cases:

"The evidence is indicative of the fact that petitioners' place of business was not operated primarily for dancing but rather for the sale of food and refreshments, revenue being derived solely from such sales." (In re Duffin, D.C.S.D.Cal.1956, 141 F.Supp. 869, 871).

"The receipts from the sale of concessions or refreshments are substantial in amount. For some months they are practically as large as the gate receipts. Upon a whole they approximate 40 per cent of the gross revenue. Should this income of this proportion be covered as something incidental only to the operation of the show? The thought suggests itself naturally that if the operator of such place of entertainment in order to make his enterprise profitable charged $1 for admission and $1 for plate or cover charge, the revenue would be exactly equal. Who could say which would be incidental to the other?

\* \* \* \* \*

"It is not believed that Congress intended by the provisions of the last amended act to limit the tax merely to admissions when other sources of revenue incident to the operation of the show might be as great or greater, but that incidentals referred only to some minor matter from which the collections must have been small or insignificant." (Kantor v. United States, D.C.N.D. Texas, 1956, 154 F.Supp. 58, 62).

The foregoing considerations aside and relying solely on the tests set out in Geer v. Birmingham, supra, the decision is inevitable that where an establishment furnishes music and dancing privileges in connection with the selling of food and drink and derives its principal source of income from the sell-

---

13. These tests relate to the overall operation of the establishment and include in addition to a consideration of relative sources of income such factors as the size of the dance floor, the seating capacity, the hours of operation, the cost of an evening's entertainment and the scope and character of the entertainment furnished.

ing of such food and drink, the receipts therefrom are subject to the so-called cabaret tax; the size of the dance floor, the seating capacity, the hours of operation, the cost of an evening's entertainment, the absence of entertainment other than dance music, and the charging of ordinary retail prices notwithstanding. Without laboring the point, several quotations from the Geer case will indicate the basic, underlying concern of the court with the source of revenue:

"A ballroom has a box office where patrons purchase a ticket of admission, and no patrons are admitted without such ticket." (88 F.Supp. at page 194).

"The greater part of the receipts of a ballroom are derived from the sale of admission tickets for dancing privileges." (88 F.Supp. at page 195).

"The Treasury Department as well as Congress apparently realized that there was a problem peculiar to roof gardens, cabarets, and the like which was not present in the case of the usual place of amusement imposing a direct admissions tax, such as a theater, skating rink, opera and the like. As noted above, that problem arose because of the nature of the operation of roof gardens and cabarets which usually imposed no admission charge as such, or only an inadequate admission charge, or would increase the prices of refreshment, service or merchandise during the period of entertainment." (88 F.Supp. at page 201).

"It is interesting to note that in the last paragraph of Mim. 5255, set out above, the Commissioner of Internal Revenue classified 'dance halls' in the same category as motion picture theaters and skating rinks, apparently regarding all of these types of entertainment as imposing a general admission charge upon their patrons and thus falling within the terms of Section 1700(a) of the Internal Revenue Code impos-

ing a tax upon amounts paid for admissions to any place rather than being within the terms of Section 1700(e) of the Internal Revenue Code taxing cabarets, roof gardens or other similar entertainments at a different rate and upon a different basis than the tax imposed by Section 1700(a) upon admissions generally." (88 F.Supp. at page 206).

"* * * it appears that dance halls or ballrooms do not follow the practice of making no charge for admission or for dancing." (88 F. Supp. at page 208).

■ This court, accordingly, holds that the plaintiff's method of operation, where his principal if not entire source of income, was from the selling of food, refreshments, and merchandise, subjects the receipts therefrom to a tax under the provisions of Section 1700(e) (1) of the Internal Revenue Code of 1939.

The plaintiff's claim to a set-off and credit for excessive amounts paid on his personal income tax during the period April 1, 1952 through March 31, 1955, arising because of his failure to deduct from the gross income of his business the cabaret tax due thereon, was not challenged by the defendant and intervenor either at the time of the hearing of oral argument or at the time of submission of briefs, or in such briefs, this claim evidently being conceded should the defendant and intervenor prevail as to the counterclaim for the unpaid balance of the cabaret tax assessment plus interest for the fourth quarter of 1954. The plaintiff's pleadings, although not as free from doubt as might be desired, on their face appear to allege a compliance with Section 7422(a) requiring a claim for credit to be filed; a filing of the claim within the period of limitations prescribed by Section 6511(a); and bringing of suit within two years of the disallowance of such a claim as required by Section 6532(a) (1). Therefore, the plaintiff's claim to a set-off and credit is allowed.

### Supplemental Opinion.

After the filing of the above opinion, plaintiff's counsel submitted to counsel for the defendant and for the intervenor, for approval as to form, a proposed order directing entry of judgment in accordance with the holdings expressed in the above opinion. The United States as intervenor immediately moved, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, 28 U.S.C., for an order "altering and amending the judgment herein entered, on the grounds [sic] that as a matter of law the plaintiff is not entitled to the requested set-off against this intervenor's counterclaim." As a further basis for its motion the intervenor alleged that its failure to contest plaintiff's claim to set-off in final argument and briefs was the result of the intervenor's honest belief that this claim had been abandoned by the plaintiff. As no judgment had been entered, a motion for relief under Rule 59 (e) was inappropriate. Accordingly, the court treated the motion as one for a new trial under Rule 59(a) limited solely to the issue of the plaintiff's claim for set-off and credit, and granted the motion, thus allowing the taking of additional testimony and the amending of findings of fact and conclusions of law if, and as, necessary. During that portion of the hearing on the motion treated as a new trial two pertinent facts were established; first, that the plaintiff had failed to comply[1] with the procedural requirements of Sections 7422(a), 6511(a), and 6532(a) (1) of Title 26 U.S.C., 1954 I.R.C., which requirements were paraphrased above, and secondly, that the taxpayer for the years in question computed, and continues to compute, his taxable income upon the cash receipts and disbursements method of accounting.[2]

In spite of the court's prior admonition that the plaintiff's pleadings regarding compliance with Sections 7422 (a), 6511(a), and 6532(a) (1) of Title 26 U.S.C., 1954 I.R.C. left much to be desired in the way of certainty and in spite of the Government's insistence subsequent to the original opinion that the filing of a claim for credit or refund was a *jurisdictional prerequisite* to the maintenance of the plaintiff's claim to a credit or set-off in this court, the plaintiff made no attempt by argument, or proof, to show that the requirements of these sections had been met but chose rather to rely on the case of Bull v. United States, 1935, 295 U.S. 247, 55 S.Ct. 695, 79 L. Ed. 1421, as authority for the proposition that the filing of a claim is not a condition precedent "to the filing of a counter-claim, or a set-off, by the taxpayer, where the impetus for the suit is provided by the government or district director."[3] Although the Bull case dealt with whether or not the running of the statute of limitations on the taxpayer's independent cause of action for affirmative relief would bar the assertion of the defense of recoupment, the court's reasoning and analysis as to the so-called doctrine of estoppel and equitable recoupment in tax cases is equally applicable to the question of whether or not the failure to file a claim for credit or refund would preclude a taxpayer from asserting the defense of recoupment to a counter-claim of the government in a case like the instant one. It is at once apparent from the face of the pleadings that the plaintiff is not entitled to relief under the doctrine evolved in the Bull case. In interpreting that doctrine the Supreme Court said in Rothensies v. Electric Storage Battery Co., 1946, 329 U.S. 296, 299–300, 67 S.Ct. 271, 272, 91 L.Ed. 296:

> "It is not contended that there is any statutory warrant for allowing barred tax refund claims by way of recoupment or otherwise. Authority for it is said to be found in case

---

1. This finding of fact is based on taxpayer's failure to assert by argument or proof any compliance with the sections herein involved.

2. Plaintiff's counsel stipulated as to plaintiff's method of accounting.

3. Plaintiff's brief, p. 2.

law and taxpayer relies chiefly on two decisions of this Court, Bull v. United States, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421, and Stone v. White, 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265. The essence of the doctrine of recoupment is stated in the Bull case; 'recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded.' 295 U.S. 247, 262, 55 S.Ct. 695, 700, 79 L.Ed. 1421. *It has never been thought to allow one transaction to be offset against another,* but only to permit a transaction which is made the subject of suit by a plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole.

"The application of this general principle to concrete cases in both of the cited decisions is instructive as to the limited scope given to recoupment in tax litigation. In both cases a single transaction constituted the taxable event claimed upon and the one considered in recoupment. In both, the single transaction or taxable event had been subjected to two taxes on inconsistent legal theories, and what was mistakenly paid was recouped against what was correctly due." (Emphasis supplied.)

The plaintiff himself, and the court considers correctly so, characterizes his claim as one for set-off not for recoupment, thus clearly placing his claim for relief outside of the limited area of permissible recovery.

The allegations of the pleadings aside, the facts dictate such a conclusion. The factual similarity between the instant case and the Rothensies case should be noted. There, for a number of years the taxpayer had paid excise taxes on certain sales and had deducted the excise taxes paid from income before calculating the income tax. After becoming convinced that the sales in question were not subject to tax the taxpayer sought, and some years later received, a refund of that portion of the erroneously assessed and paid excise taxes which had not been barred by the statute of limitations at the time the refund claim was filed. The Commissioner treated the refunded excise tax as income for the year in which it was received and, accordingly, assessed additional income and excess profits taxes thereon. The taxpayer, in addition to resisting the inclusion of the refund in income, in the alternative attempted to assert by way of recoupment against the additional income and excess profits taxes assessed and paid that portion of the erroneously assessed and paid excise taxes, refund of which had been barred by the statute of limitations at the time of the filing of the claim for refund. The Supreme Court refused to allow recoupment holding that the Government's demand for additional taxes and the taxpayer's claim for refund of illegal assessments and payments did not arise out of the same subject matter, as the demand and the claim for recoupment did not involve a single taxable event. It likewise follows in the instant case that the Government's counter-claim for the unpaid balance of the cabaret tax assessment plus interest for the fourth quarter of 1954 and the plaintiff's alleged claim to a "set-off and credit against any and all sums owed as a cabaret tax for the period April 1, 1952 through March 31, 1955 * · * * "[4] allegedly arising out of a failure to deduct said cabaret tax from the gross income of his business in computing personal income tax for the period April 1, 1952 through March 31, 1955 do not involve a single taxable event.

■ Failing thus to come within the doctrine of the Bull case and having failed to comply with the statutory mandate that no "proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or col-

4. Paragraph 2 of p. 2 of plaintiff's reply to counter-claim of the Government.

lected, \* \* \* or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard \* \* \*", 26 U.S.C.A. § 7422(a), pertinent provisions including a period of limitations for the filing of the claim and a period of limitations for the bringing of suit subsequent to a disallowance of said claim, the plaintiff, had his claim to set-off and credit been meritorious, would have found himself without redress. However, it is clear, as a matter of substantive tax law, that the taxpayer is not entitled to a deduction of the federal cabaret excise taxes for purposes of computing federal income tax for the years 1952–1955. If, as is here the case, the taxpayer computes his taxable income upon the cash receipts and disbursements method of accounting, then he must pay the excise taxes to the Government in order to be entitled to a deduction from gross income. That he has not done, except to the extent of $50 for the fourth quarter of 1954, which payment, however, was not made until January 31, 1955.

The relevant statutory provisions, as they appear in the Internal Revenue Code of 1939,[5] are as follows:

"§ 23. Deductions from gross income \* \* \*

"(a) Expenses.

"(1) Trade or business expenses.

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, \* \* \*" (26 U.S.C.1952 ed., Sec. 23).

"§ 41 General rule

"The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year." (26 U.S.C.1952 ed., Sec. 41).

"§ 43. Period for which deductions and credits taken

"The deductions and credits (other than the corporation dividends paid credit provided in section 27) provided for in this chapter shall be taken for the taxable year in which 'paid or accrued' or 'paid or incurred', dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period. \* \* " (26 U.S.C.1952 ed., Sec. 43).

"§ 48. Definitions

"When used in this chapter—

\* \* \* \* \* \*

"(c) 'Paid or incurred', 'paid or accrued'. The terms 'paid or incurred' and 'paid or accrued' shall be construed according to the method of accounting upon the basis of which the net income is computed under this Part. \* \* \*" (26 U.S.C.1952 ed., Sec. 48).

The taxpayer does not even attempt to argue that the cabaret taxes which

5. For the purposes of this opinion the corresponding successor provisions of the Internal Revenue Code of 1954, §§ 162, 446, 461, 7701(a) (25) are, if not identical, at least substantially similar and, therefore, need not be differentiated or quoted.

he seeks to deduct from gross income have been paid or have accrued as that term has been defined by the Supreme Court.[6] His contention is that a claim to set-off being authorized by Rule 13 of the Federal Rules of Civil Procedure "once this Court determined that the plaintiff's place of business was subject to the cabaret tax herein, the government and/or its agents, had in its possession a sum of money which the plaintiff had paid as income tax, which lost its status as such because it was an overpayment, in view of the fact that plaintiff did not deduct from his gross income that portion *required to be paid* as cabaret tax.[7] * * * Whatever classification may be put on this over-payment, it is clear that the government cannot retain it as over-paid income tax; *equitable principles* require that it be applied toward the reduction of the amount which this Court has held was due and owing to the government as cabaret tax."[8] (Emphasis supplied.)

The lack of merit of the plaintiff's position is clearly demonstrated by the following statement of the general rule governing the application of equitable principles to the allowance of deductions.

"It is well-settled that a taxpayer is free to adopt such [methods of accounting as may be authorized by statute or appropriate regulation] but having done so he must accept the tax consequence of his choice; this is so whether he contemplated such consequence or not. [Citing in

a footnote: Old Mission Portland Cement Co. v. Helvering, 1934, 293 U.S. 289, 293, 55 S.Ct. 158, 79 L.Ed. 367; Founders General Corp. v. Hoey, 1937, 300 U.S. 268, 275, 57 S.Ct. 457, 81 L.Ed. 639; Higgins v. Smith, 1940, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406.] And on that score it must be noted that allowance of deductions does not turn upon general equitable considerations and that such allowance 'depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed.' [Citing in a footnote: New Colonial Ice Co. v. Helvering, 1934, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348; Deputy v. DuPont, 1940, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416.]

"We should like to note, however, that in our view the result reached is not inequitable in the instant situation." Montana Power Co. v. United States, 3 Cir., 1956, 232 F.2d 541, 544, certiorari denied 1956, 352 U.S. 843, 77 S.Ct. 51, 1 L.Ed.2d 59.

It is equally true that resort may not be had to general equitable principles to

"* * * upset the well-understood and consistently applied doctrine that cash receipts or matured accounts due on the one hand, and cash payments or accrued definite obligations on the other, should not be taken out of the annual accounting system and, for the benefit of the

---

6. "It has long been held that, in order truly to reflect the income of a given year all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer. Here the taxpayer was strenuously contesting liability in the courts and, at the same time, deducting the amount of the tax, on the theory that the state's exaction constituted a fixed and certain liability. This it could not do. It must, in the circumstances, await the event of the state court litigation and

might claim a deduction only for the taxable year in which its liability for the tax was finally adjudicated." Dixie Pine Products Co. v. Commissioner, 1944, 320 U.S. 516, 519, 64 S.Ct. 364, 365, 88 L. Ed. 270. Accord: Security Flour Mills Co. v. Commissioner, 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725. See also: Baltimore & Ohio R. Co. v. Magruder, 4 Cir., 1949, 174 F.2d 896, affirming D.C. D.Md.1948, 77 F.Supp. 156, certiorari denied 1949, 338 U.S. 828, 70 S.Ct. 79, 94 L.Ed. 504.

7. Plaintiff's brief, p. 2.

8. Plaintiff's brief, p. 3.

Government or the taxpayer, treated on a basis which is neither a cash basis nor an accrual basis, because so to do would, in a given instance, work a supposedly more equitable result to the Government or to the taxpayer.

\* \* \* \* \* \*

"The rationale of the system is this: 'It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation.'

"This legal principle has often been stated and applied. The uniform result has been denial both to Government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, applying the accrual basis, the year in which the right to receive, or the obligation to pay, has become final and definite in amount." Security Flour Mills Co. v. Commissioner, 1944, 321 U.S. 281, 285, 286, 287, 64 S.Ct. 596, 598, 88 L.Ed. 725.

■■■ Likewise, alleged equities do not permit a hybrid method of accounting and if, as the Supreme Court has time and again held, a taxpayer computing income on an accrual basis must take deductions in the year of accrual, it clearly follows that a taxpayer on a cash receipts and disbursements method of accounting must take deductions in the year of payment. Security Flour Mills Co. v. Commissioner, 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; United States v. Olympic Radio & Television, Inc., 1955, 349 U.S. 232, 75 S.Ct. 733, 99 L.Ed. 1024; Lewyt Corporation v. Commissioner, 1955, 349 U.S. 237, 75 S.Ct. 736, 99 L.Ed. 1029.

For the foregoing reasons the plaintiff's claim to a set-off and credit for excessive amounts paid on personal income tax during the period April 1, 1952 through March 31, 1955, allegedly arising because of failure to deduct from the gross income of the business the cabaret tax due thereon must be denied; and to the extent indicated by this supplemental opinion the findings of fact and conclusions of law set forth in the original opinion are hereby amended.

### Addendum

Although the court has previously pointed out what it considered the distinguishing factors between Flora v. United States, 10 Cir., 1957, 246 F.2d 929 and the instant case, in view of the recent affirmation by the Supreme Court 1958, 356 U.S. ——, 78 S.Ct. 1079 of the holding of the Court of Appeals for the Tenth Circuit in the Flora case that a taxpayer must pay the full amount of an income tax deficiency before he may challenge its correctness by a suit for refund under 28 U.S.C.A. § 1346(a) (1), an excess of caution impels a reiteration of those factors, specifically as directed to the opinion of Mr. Chief Justice Warren speaking for the majority of the Supreme Court, and a consideration of what constitutes, as regards the cabaret tax, an independent taxable item.

While in the Flora case a deficiency assessment was levied prior to the part payment of said assessment by the taxpayer and, consequently, prior to the filing of a claim for refund or suit for refund, in the instant case the taxpayer first made payment of fifty dollars and simultaneously filed a claim for refund. By statutory mandate of Section 7422(e) of Title 26 U.S.C.A., previously set out in this opinion, had this claim for refund been one for income tax and had it been disallowed, the taxpayer perfecting his suit in this court prior to the issuance of notice of a deficiency assessment, the result would have been "to give the taxpayer the choice of which court [the district court or Tax Court] shall have ju-

risdiction."[1] Why this choice expressly given by Congress or why "concurrent jurisdiction in the district court (or Court of Claims) and in the Tax Court over the same case"[2] explicitly recognized by Congress should be subject to defeat by the mere administrative act of assessing a deficiency prior to the rejection of the taxpayer's claim for refund, which claim for refund is made a jurisdictional prerequisite to any suit, is open to serious question, a question not answered by the Supreme Court decision in Flora as the Court did not cite, comment upon or consider the effect of subsection (e) of section 7422.

█ The Flora case dealt with a deficiency in income tax. The instant case deals with a deficiency assessment of excise taxes. Without elaborating upon what has already been said in this opinion regarding the lack of jurisdiction in the Tax Court over excise taxes with concomitant hardship to the taxpayer and the absence of alternative remedies, such as the Supreme Court indicated would be present in the case of suit for recovery of income tax, it is necessary to reexamine the divisible nature of the excise tax.

"Income taxes and estate taxes flow from calculations involving complicated considerations of credits, exemptions, etc. The resulting tax has been influenced by and reflects these considerations. They are not naturally separable as in the case of the stamp tax. It is a wise law that governs their prepayment before suit can be brought. Otherwise, the power of collection of taxes would be continuously impeded and rendered practically useless. But in the case of these separable items the issue is clear-cut. There can be no complicated questions of credits, exemptions, and the like. It is simply an issue of whether or not the stamp should be applied and in what amount." Friebele v. United States, D.C.N.J.1937, 20 F.Supp. 492, 493.

Relying on Friebele v. United States,[3] this court holds that if prepayment of a cabaret tax "deficiency" is a prerequisite to suit, this requirement is met by payment in full of the tax on any independent taxable item or event even although this payment may constitute but a partial payment of the entire assessment. Geer v. Birmingham,[3] D.C.Iowa 1950, 88 F. Supp. 189, 191, the leading case in the field of cabaret taxes and one expressly recognized by Congress as authoritative in determining whether or not an establishment is operating as a cabaret or as a dance hall, dictates the conclusion that where the tax is not collected from the patron but is assumed by, and paid by, the person owning and operating the establishment, the taxable event constitutes one day's receipts and that payment in the sum of twenty percent of gross taxable receipts for one day constitutes payment of the "cabaret tax" in full. This conclusion is supported in part by administrative regulations. 26 C.F.R. section 101.32 provides in part:

"* * * (b) Admissions subject to tax under section 1700(e), as amended. (1) Every person required to pay the tax imposed by section 1700(e), as amended, on charges made for admission, refreshment, service, and merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, must keep or cause to be kept adequate and sufficient records *with respect to the operations for each day on which such public performances are held showing* (i) the receipts from charges made for admission, refreshment, service, and merchandise paid by all patrons entitled to be present during any part of the performance; and (ii) *the tax due.*

"(2) Where the passing on of *the tax* is evidenced by the use of waiters' checks or bills which show the *tax as a separate item* or by the use

1. Senate report on section 7422(e)—1954 U.S.Code Cong. & Adm.News, Vol. 3, p. 5261.

2. See note 1.

3. Discussed in detail, supra.

of a cash register which records *the tax* under separate symbols on the cash register tape, as provided by paragraph (d) (1) or (2) of section 101.13, the *total receipts* from patrons (*exclusive of tax*) and *the total taxes* passed on to them as disclosed by waiters' checks or bills or the cash register tapes *for each day should be entered on the daily record.* Where *the tax* is not shown as a separate item but the passing on of *the tax* is evidenced by the use of signs or by statements on the menus, as provided by paragraph (d) (3) of section 101.13, the *gross receipts for each day* should be entered *in the daily record.*

"(3) Such records shall contain sufficient information to enable the Commissioner to determine whether the correct amount of *tax* has been paid. The records shall at all times be open for inspection by internal revenue officers, and shall be maintained for a period of at least four years from the date the tax became due." * * * (Emphasis supplied.)

 This regulation could also be relied upon as authority for the proposition that the smallest taxable item or event is the amount paid by any one patron for refreshment and merchandise. The so-called "cabaret tax" is imposed by subsection (e) (1) of section 1700, 1939 I.R.C., which section as previously pointed out in this opinion, was originally enacted to impose "a tax in the nature of an admissions tax upon entertainments of various kinds." Geer v. Birmingham, supra, 88 F.Supp. at page 196. In the case of an "admissions tax" the smallest taxable item or event would be the amount paid for one admission by one patron. There would appear to be no logical reason for treating the taxable item or event giving rise to the imposition of a "cabaret tax" in any different manner particularly since the cabaret tax is a species of admissions tax, is set out in the Internal Revenue Code of 1954 under Part I, entitled "Admissions", of subchapter A, entitled "Admissions and Dues", of Chapter 33, entitled "Facilities and Services". The only possible distinction is that the admissions tax is imposed upon and paid by the person paying for admission while the cabaret tax, although it may be passed on to the patron and regardless of whether or not this is done, is imposed upon the person receiving the amount paid for refreshment or merchandise. It does not follow that because, by administrative regulation daily records are required to be kept, monthly returns are to be filed together with monthly payments, and in the instant case a quarterly assessment was made, the tax accrues daily, monthly or quarterly. These administrative provisions (26 C.F.R. sections 101.32; 101.31; 101.33), apply both to an owner and operator of an establishment who merely collects the admissions tax and to an owner who by statute is made personally liable for the cabaret tax. In those cases where one is a collector, the divisible nature of the tax, refund of which the taxpayer is herein seeking, is demonstrated by the pertinent regulations dealing with credit, abatement or refund of tax on admissions or dues.

"Section 101.41 Credit for overpayment.

\* \* \* \* \* \*

"(b) Credit for tax overpaid may be taken on a succeeding return, but a complete statement of the facts must be attached to the return on which the credit is claimed. *If the amount overpaid was collected from other persons,* there must be submitted a sworn statement showing *repayment to the other persons.* In the case of dues or initiation fees a complete list of the members making excess payments must be submitted, and it must be shown that no *claim for refund* has been filed *by any member.*

\* \* \* \* \* \*

"Section 101.42 Abatement or refund of erroneous or illegal assessments or collections.

\* \* \* \* \* \*

"(b) In any case where a club as agent of its members seeks a refund of *tax collected* by the club *and paid over* by it to the collector of internal revenue, *since the members* and not the club *are the actual taxpayers,* the claim must be accompanied by the following:

"(1) An alphabetical list of the names of the taxpayers, showing the *amount claimed in refund in behalf of each,* and the dates on which the amounts were paid to the collector of internal revenue.

"(2) *A power of attorney executed by each person* in whose behalf the claim is filed \* \* \*.

\* \* \* \* \* \*

"(c) *If a member files a refund claim himself* \* \* \*.

\* \* \* \* \* \*

"Section 101.43 Refund of over-collections

"Every person who makes an excess collection of tax under section 1700 or section 1710 shall upon proper application promptly refund such amount to *the person entitled thereto,* even though it has already been paid over to the collector of internal revenue and no corresponding credit or refund (see sections 101.41 and 101.42) has yet been secured. As the tax on admission is based on the payment, not the admission, no refund of any part of such a tax is authorized merely because the person paying for admission does not actually make use of his right to admission. Where, however, an amount paid for admission is refunded it will be treated, as far as tax liability is concerned, as not having been paid, and *the tax collected* should be *refunded* to the taxpayer at the same time the payment for admission is refunded \* \* \*." (Emphasis supplied.)

These provisions contemplate a claim for, and a right to, refund by an individual taxpayer for the tax paid by him on one single admission. The same should be true in the instant case.

▮▮▮▮ Accordingly, the court holds that the payment by the taxpayer of fifty dollars, whether the proper taxable item or event be considered one day's gross taxable receipts [4] or the total amount received from any one patron, thus entitling him to be present during any portion of a public performance, constituted payment in full of the cabaret tax imposed thereon.

The original and supplemental opinion, and the addendum, embody the court's findings of fact and conclusions of law, F.R.Civ.P. 52(a), 28 U.S.C.A. Should counsel desire other or further findings and conclusions, they may be submitted.

Let judgment be entered in accordance herewith.

---

4. Testimony indicated one night's gross receipts in the fourth quarter of 1954 varied from seventy-two to ninety-two dollars. Similarly a division of the total gross receipts in said quarter by the number of days taxpayer operated his business resulted in average daily gross earnings of approximately eighty-six dollars.